CHARLES DOUGLAS CONYERS LANG, ROBIN ARTHUR LANG, JOHN ALEXANDER FORBES-LEITH, ANDREW GEORGE FORBES-LEITH, ANNE ROSEDEW FORBES-LEITH and MARY ELIZABETH FORBES-LEITH, Minors, By CLAUDE I. BAKEWELL, Their Next Friend; ROBERT IAN ALGERNON FORBES-LEITH and LORNA MARSALIE PRIOR v. MISSISSIPPI VALLEY TRUST COMPANY, Successor Trustee Under the Will of JEMIMA LINDELL and ISABEL VALLE BROOKINGS, Defendants, ISABEL VALLE BROOKINGS, Appellant.—124 S. W. (2d) 1198.

Division One, February 8, 1939.

980

*Luther Ely Smith* and *Luther Ely Smith, Jr.,* for appellant.

*Paul Bakewell, Jr.,* for respondents.

BRADLEY, C.—Jemima Lindell executed her will May 26, 1891, and a codicil March 17, 1894. She died in 1896, and the will, with codicil, was probated in the probate court of St. Louis, February 27, 1897. The minor plaintiffs, John Alexander Forbes-Leith, Andrew George Forbes-Leith, Anne Rosedew Forbes-Leith and Mary Elizabeth Forbes-Leith are the children of plaintiff, Robert Ian Algernon Forbes-Leith, and the minor plaintiffs, Charles Douglas Conyers Lang and Robin Arthur Lang are the children of plaintiff, Lorna Marsalie Prior. Robert Ian Algernon Forbes-Leith and Mrs. Prior, the adult plaintiffs, are brother and sister, and reside respectively in Scotland and England.

The situation existing in this cause resulted from transactions respecting a forty-eight-year lease (from June 30, 1931) on the building then occupying the northeast corner of Twelfth Street and Washington Avenue, St. Louis. The lease was executed February 28, 1930, but as stated, commenced to run June 30, 1931. At the time of the effective date of the lease, defendant, Mississippi Valley Trust Company, held title, as successor trustee under the will, to an undivided one-half interest in the above mentioned building and the lot it occupied, and the adult plaintiffs held fee title to the other one-half undivided interest. Isabel Valle Brookings, appellant, at the effective date of the lease, was entitled, under the will, to receive for life

one-half of the rents from the leased premises, and the adult plaintiffs were entitled to receive the other half. Under the will a lease made by the trustee could not exceed fifty years.

The lessors were the adult plaintiffs and the successor trustee, and the lessee was the Midwest Industrial Development Company. The rental was $75,000 per year, payable in advance in monthly installments of $6250 on the first day of each month. Lessee was to bear the burden of upkeep and to pay taxes, insurance, etc. At the time of the execution of the lease there were pending (or about to be) condemnation proceedings by the City of St. Louis, which proceedings contemplated widening Twelfth Street, and would affect the leased property. The lease provided that the lessors would receive any damages awarded in the condemnation proceedings "for that portion of land so taken, less any benefits assessed thereon," and the lessee was to "receive any damages awarded for that portion of the building or improvements taken or damaged." The lease also provided that the lessee was to remodel the building to conform to the situation existing after the taking, by condemnation, of a portion of the land and building. The lease further provided that the condemnation would not reduce the rental, unless one-fourth or more of the total ground area was taken, in which event the lessee would be entitled to a reduction in rent, and it was provided that in the event the lessors and the lessee could not agree upon such reduction, then each was to select an appraiser, and these appraisers were to select an umpire, and the matter would be arbitrated, so to speak. If the lessors refused to select an appraiser, then the lessee could apply to the circuit court for such appointment.

The condemnation proceedings were settled by agreement between the city on the one hand and the lessors and the lessee on the other. By the condemnation settlement, the city took the west 32 feet and 11 inches and paid to the lessee the sum of $431,741.35 as damages to the building and improvements, and paid to the lessors $102,591.94 as damages for the land taken. After the payment of the awards, the lessee sought an agreement with the lessors to remove the old building instead of remodeling, and to erect a new building, and on August 12, 1931, such an agreement was made. On same day, the lessee gave its surety bond in the sum of $600,000, conditioned upon the erection of a new building in two years on the leased premises, according to certain plans and specifications. September 26, 1932, the time for the completion of the new building was extended to October 1, 1935, and the surety bond was likewise extended. November 1, 1932, the lessee defaulted in payment of rent and claimed a reduction in the rental on the theory that more than one-fourth of the total ground area was taken by the condemnation, and demanded that appraisers be appointed. Appraisers were not appointed, and lessee continued to default in payment of rent.

December 28, 1933, lessors filed suit against lessee for the rent then due and to determine the rights of the parties. June 28, 1935, a decree was entered holding that the condemnation did not take one-fourth of the total ground area, and lessee was enjoined from applying to the circuit court for appointment of appraisers to determine the question of rent reduction. Judgment for rent (from November 1, 1932, to and including December, 1933) and interest thereon in the total sum of $98,598.01 was given against lessee.

After the agreement for the erection of a new building, lessee razed the old building and did some construction work towards the erection of a new one, but finally abandoned construction work, and sought a settlement of the whole matter, including cancellation of the lease. November 27, 1935, such an agreement was reached. Lessee, under the terms of the settlement agreement, paid to lessors $1,160,013.56, and the lease was canceled.

Upon the settlement resulting in the payment of $1,160,013.56 by lessee to lessors and the cancellation of the lease, lessors executed this receipt:

"RECEIPT

"November 27, 1935.

"Received of the Central Terminal Company (name of lessee was changed) the following amounts:

"As the replacement value of the building existing at the time the lease was made .........................$600,000.00

"As rental at the rate of $6,250.00 per month from November 1, 1932, to November 30, 1935, ................ 231,250.00

"As interest at 6% on each installment of rental from the date due under the lease to November 30, 1935, ...... 21,968.75

"As the portion of taxes for the year 1935 as represented by 11 months of such year ..................... 6,794.81

"In consideration of cancellation of said lease and all agreements supplementary thereto and of all obligations of lessee arising thereunder ........................ 300,000.00
_____

"$1,160,013.56"

The present cause was filed February 18, 1936. The will and codicil are set out in full in the petition. The original trustee, Wilbur F. Boyle, by the will was given the power to sell, etc., but the power given the original trustee "to sell" was *personal* to him, and such power could not be exercised by a successor trustee. The original trustee died March 28, 1911, and thereupon, by the terms of the will, defendant, Mississippi Valley Trust Company, became the successor trustee.

In the petition plaintiffs recite the facts showing the respective interest of plaintiffs and defendants. Also, the petition recites the facts as to the lease, the condemnation, the litigation between lessors

and lessee, the final settlement between the lessors and lessee, and the payment of the $1,160,013.56 by the lessee to lessors. It is not necessary to consider the pleadings at length. It is sufficient to say that the controversy concerns the disposition of the $600,000 paid by the lessee as the replacement value of the building on the premises at the time the lease was made, and the disposition of one-half of the $300,000 paid by the lessee as a consideration for the cancellation of the lease. Mrs. Brookings claimed all of the one-half of the $300,-000 paid by the lessee for the cancellation of the lease. Her claim as to the $600,000 and the court's finding as to that sum appears, infra.

The trial court found that one-half of the $300,000 paid by the lessee for cancellation of the lease was held by the successor trustee as a part of the assets of the trust estate, and decreed that this half be divided into forty-four parts (term of lease from date of judgment was 44 years), and that one of these parts be paid annually, from November 30, 1935, to Mrs. Brookings, appellant, during her life, and that upon her death the portion remaining "be turned over" to the remaindermen under the will; that the income derived from any investment that might be made of any portion of the one-half of the $300,000 paid by the lessee for the cancellation of the lease and remaining from year to year during the life of Mrs. Brookings be paid annually to her during her life.

Mrs. Brookings' age at the time of the decree was fifty-nine years and eight months, and it was decreed (as an alternative), that, in the event she desired to have the present worth of her interest in the one-half of the $300,000, instead of a portion each year during her life she would be so permitted by applying in writing to the successor trustee. And it was directed that the present worth be ascertained under Section 3112, Revised Statutes 1929. It was decreed that in the event Mrs. Brookings decided to receive and received the present cash value, then the successor trustee was directed to hold the remainder of said sum until the death of Mrs. Brookings, and pay to her during her life, in annual installments, the income derived from the fund, and upon her death whatever sum remained from this fund to be turned over to the remaindermen.

Mrs. Brookings, appellant, assigns error on the judgment and direction of the court as to the one-half of the $300,000 paid by the lessee for the cancellation of the lease, and on the judgment and direction as to the $600,000 paid by the lessee as the replacement value of the building.

Is Mrs. Brookings entitled to all of the one-half of the $300,000 as she contends? Counsel for Mrs. Brookings say in the brief that they have been unable to find an American case (and we find no such case) entirely in point on the question, but an English case is cited,

In re Hunloke's Settled Estates, 1 Ch. 941 (1902) which deals with a question quite like the one here.

In the case of In re Hunloke's Settled Estates, it appears that a testator, by his will dated July 4, 1845, devised his real estate to trustees in what is termed in strict settlement, and empowered any life tenant in possession to grant mining leases for terms not exceeding sixty years at such annual rent or royalties, and upon such terms and conditions as should be thought reasonable. There was no provision as to the application of money paid by a lessee for cancellation of a lease. The testator died in 1856. December 1, 1899, the legal life tenant in possession executed a lease of certain seams of coal to certain lessees for the term of twenty-two years from July 1, 1898, subject to certain royalties and subject to what is termed dead rent of 430 pounds per year for the first two years of the term, and a dead rent of 75 pounds per year for the remainder of the term. The lessees could terminate the lease at the expiration of any year or half year of the term by giving six months' written notice, paying the rent and royalties up to the expiration of that year or half year, and by paying the dead rent for the remainder of the term of the lease. The lease was terminated July 1, 1901, and lessees paid the life tenant as required, and the amount of the dead rent paid for the remaining nineteen years of the lease was 1425 pounds. The question was whether the life tenant was entitled to retain the 1425 pounds as her own. It was held that, absent bad faith, "money paid to a legal life tenant as the consideration for accepting the surrender of a lease belongs to the life tenant." No bad faith appeared in the case and the decision was that the life tenant was entitled to retain the 1425 pounds as a *casual profit*.

In Campbell et al. v. Kawananakoa et al., 31 Hawaii, 500, the facts and the holding correctly appear in headnote 7 as follows: "A testator in his lifetime gave to D. a lease for fifty years (from January 1, 1890) of a large area of lands suitable for sugar plantation purposes. . . . D. granted to E. a sublease of a portion of the lands for the remainder of the term. D. assigned the original lease to F., and F. granted a sublease to O. of another part of the lands for the remainder of the term. Subsequently, when about ten years of the terms of the subleases remained unexpired, the trustees under the will received a joint bid or offer from the two sublessees for a new lease direct to them for fifty years from date of offer at a very largely increased rental for the period beginning with the expiration of the old leases and with an undertaking to pay in addition a certain stipulated sum ($200,000) annually for the years preceding the expiration of the old leases. . . . The will provided that all net income of the estate should be paid semiannually to the testator's four daughters during their lives and after the death of each of the daughters to her children (*per stirpes*), until the termination of the

trust. Held, that the stipulated sums which are to be paid annually before the expiration of the old leases are *income* and are to be distributed by the trustees to those who, at the time of the accrual of each such sum, are *the income-takers under the will.*" (Italics ours.)

In the case of Archambault's Estate, 232 Pa. St. 347, 81 Atl. 314, the facts are these: Archambault died testate January 10, 1906, seized in fee of certain premises in Philadelphia. The will devised this property to trustees with power to sell, lease, etc. The net income was payable, during her life, to testator's wife. At the time of the testator's death the property was leased for a term ending January 1, 1913, at an annual rental of $12,500, payable monthly in installments of $1041.67. January 1, 1909, the original lessees consenting, the trustees leased the premises to a gas company for a term of ten years. The consideration for the new lease was $10,000 cash, $1041.67 to be paid monthly until the expiration (January 1, 1913) of the first lease, and thereafter $1750 per month during the remainder (4 years) of the second lease. The controversy concerned the $10,000. All of it was claimed by the widow. In ruling the question the court said:

"In the case at bar, the widow is entitled under the will of her husband to the entire net income accruing from the premises at Eleventh and Market Streets during her lifetime. As to when or how the income should be paid to her by the trustees, the will is silent. But the net income belonged to her, whenever it was realized. It matters not whether the sum of $10,000 in question be regarded technically as rent, as it was called in the lease, or as a bonus; *it was certainly income derived from the premises,* which were made the subject of a trust for her benefit during her lifetime. Being received by the trustees during the lifetime of the widow, she was clearly entitled to it under the will. . . . The remaindermen have not been prejudiced in any way by the transaction." (Italics ours.)

In the present case plaintiffs also rely on an English case, In re Rodes (styled also Sanders v. Hobson), 1 Ch. 815 (1909). In that case it appears that Rodes, in February, 1883, devised his real estate to trustees. Under the trust Sophy Felicite Sanders (later Mrs. Locker Lampson) was tenant for life. June 30, 1906, Mrs. Locker Lampson, under the authority of the settled land act of 1882, executed a lease on a coal mine, a part of the estate. The lease was for twenty-one years from July 1, 1906. September 24, 1906, the lessees assigned the lease. In March, 1908, the assignee of the lease "passed resolutions for a voluntary winding-up." December 22, 1908, the lease was canceled for a consideration of 1000 pounds paid to Mrs. Locker Lampson, the life tenant. The question was whether she "was entitled to retain the 1000 pounds, or whether some or all of it ought to be treated as capital." In re Hunloke's Settled Estates, supra, was relied on to support the contention that Mrs. Locker Lampson,

the life tenant, was entitled to all of the 1000 pounds. It was held that the 1000 pounds should be paid "by installments as to the tenant for life." In distinguishing the case of In re Hunloke's Settled Estates the chancellor said:

"That was a case in which a legal tenant for life accepted a surrender without reference to the settled land acts, and it was held . . . that she was entitled to retain the moneys paid to her in consideration of the surrender. But if the case be examined it appears that the reasons for the decision were that prima facie the position of a legal tenant for life is not fiduciary, and also that in cases where powers of leasing are conferred on a legal or equitable tenant for life by deed or will the power is construed as non-fiduciary and as having no reference to the interests of the remaindermen, but only to those of the tenant for life. On the other hand, under S. 53 of the settled land act, 1882, the tenant for life is a trustee, and if he accepts a surrender he must do so for the interests not only of himself, but for those of the remaindermen, and if he receives a consideration for accepting it, then, on ordinary principles, a court of equity will distribute the money between the tenant for life and the remaindermen on principles which it thinks fair. That is done on account of the position of the tenant for life as a trustee and in order to see that justice is done between the parties."

As we read the Rodes case it was the statute which impelled the conclusion. In the present case no such situation exists, and further, in the present case, Mrs. Brookings was not a party to the execution of the lease or its cancellation, and in no sense a trustee.

In 25 Laws of England 663, by the Earl of Halsbury, Lord High Chancellor "and other lawyers," it is stated: "If compensation is payable by the lessee, then, in a case *outside the settled land acts* (italics ours), money paid to a legal tenant for life as the consideration for accepting the surrender of a lease belongs to that life tenant. The reason for this, however, is that prima facie the position of a legal tenant for life is not fiduciary, and also that in cases where powers of leasing are conferred on a legal or equitable tenant for life by deed or will such powers are construed as non-fiduciary and as having no reference to the interests of the remaindermen, but only to those of the tenant for life. On the other hand, if the tenant for life accepts a surrender under the settled land acts, he must do so in the interests not only of himself, but of the remaindermen, and if he receives a consideration for accepting it, then a court of equity distributes the money between the tenant for life and the remaindermen on principles which it thinks fair."

Plaintiffs, respondents here, cite Dickson et al. v. Allen et al. (Mo.), 195 S. W. 698, and Duffy v. Central Railroad Co., 268 U. S. 55, 45 Sup. Ct. 429, 69 L. Ed. 846.

The facts in the Dickson case are these: Gerald B. Allen died testate in 1887. He devised his real estate in St. Louis to trustees "for a period measured by the lives of his three children and their descendants then in being." In a suit by the trustees to construe the will it was held that the trustees had power to make ninety-nine-year leases. March 6, 1906, the trustees made a ninety-nine-year lease of a lot at the northwest corner of Broadway and Pine Streets. The lessee was the Lilburn Realty Company. At the time of the lease there was on the lot "an old 4 story brick and stone building in a fair tenantable condition." The rental was $20,000 per year, payable quarterly in advance. Under the terms of the lease, the lessee was to pay taxes and insurance, and to erect on the lot within five years and pay for "a $250,000 modern fireproof building." There was a stipulation in the lease that the old building "was of the value of $50,000." Pursuant to the terms of the lease, the lessee gave a bond "in the penal sum of $50,000, conditioned for the faithful performance of all the covenants in the lease contained, until said proposed new building should be erected and fully paid for by the lessee." There was also a provision in the lease for an additional $100,-000 bond to be given before the lessee commenced to wreck the old building, but that bond was never given and the old building was never wrecked.

The lessee went into possession under the lease and "for some five years paid the rent and taxes," but in 1911, made default on three covenants; March 6, 1911, to erect the new building; September 6, 1911, first default in payment of rent, $5,000 due on that date; December 31, 1911, first default in payment of taxes. From December 31, 1911, to November 12, 1912, the lessee "continued in utter default on all" of the covenants of the lease, and on November 12, 1912, "the aggregate amounts in default were: (1) On covenant to erect a new building, unliquidated; (2) total rent in arrears, five quarterly installments at $5,000 each, including installments for quarter ending December 6, 1912, due in advance on September 6, 1912, $25,000; (3) taxes for the years 1911 and 1912, general and special, aggregating $8,525.02."

November 12, 1912, the lessee was insolvent, and the trustees proposed to the lessee and the surety on the $50,000 bond to cancel the lease and bond, "and take the property back in its then dilapidated condition, and to accept in full of all . . . claims, liquidated as well as unliquidated," as follows: The full amount of the bond to be paid by the surety on the bond; the payment to the trustees by the lessee of all rents, $10,789.86, paid to lessee since the lessee defaulted in the payment of rent. The offer of settlement was accepted, and the surety on the bond paid the $50,000, and the $10,789.86 was paid by the lessee, and the lease was canceled. Upon receiving

the $60,789.86, the trustees proceeded to dispose of it "as they believed to be in accordance with the will." The disposition was as follows: They paid the taxes ($10,389.41) for 1911 and 1912, and a portion of 1913 taxes; they disbursed as income, to the beneficiaries entitled thereto, all the rent ($23,666.63) accrued under the lease from September 6, 1911, to November 12, 1912, the date the lease was canceled. This left in the hands of the trustees $26,733.78, "which they proposed to apply toward defraying the expenses (estimated in excess of $30,000) of reconstructing the old building on the leasehold premises which had greatly deteriorated from age and usure, believing that this sum had come into their hands in settlement of their claim for unliquidated damages against the lessee in the ninety-nine-year lease by reason of lessee's default on the covenant to erect and pay for a new fireproof building on said lot."

The will provided that "until the last survivor of certain descendants of the testator then in being shall have died, the income of the trust estate is to be divided annually into two portions, a surplus fund and a reserve fund." The surplus fund was to consist of seventy-five per cent of each year's net income, and this fund was to be disbursed annually to the life beneficiaries. The remaining twenty-five per cent of each year's net income was the reserve fund, "to guard against losses by shrinkage or other contingencies." However, the trustee could, under certain conditions, make advances from the reserve fund.

It was contended by the plaintiffs (life beneficiaries) that the reconstruction of the old building should be paid out of the reserve fund and that all of the $26,733.78 should be distributed as income.

The sole question was whether the $26,733.78 belonged to the surplus fund or to the reserve fund. The trial court held that this sum belonged to the surplus fund. On appeal this holding was reversed. In ruling the question the court said that it was "perfectly clear" that the $26,733.78 was "in no sense of the term 'rents or profits' from the real estate." The ruling in effect was that the $26,733.78, except as to a small amount, represented damages for failure of the lessee to erect a new building. The court said (195 S. W. l. c. 702) : "The authorities seem to be practically unanimous in holding that money collected by trustees as damages done to or compensation paid for loss or injury to the *corpus* of the trust estate, in equity, becomes substituted trust capital, and not income therefrom, and this seems to be so even though the amount collected was greater than the damage, loss or injury sustained by the *corpus*."

It seems clear that the Dickson case does not support the disposition by the trial court decree as to the one-half of the $300,000 paid by the lessee for the cancellation of the lease. Neither does the Duffy case support such disposition.

Mrs. Brookings was entitled to receive for life one-half of the income from the property at the northeast corner of Twelfth Street and Washington Avenue. The parties to the lease, acting in good faith, had the right to cancel the lease. It was canceled and $300,000 was received for such cancellation, and the one-half thereof came into the hands of the successor trustee by virtue of the cancellation. Clearly, we think, under the facts, the whole of the $300,000 was *income,* and if so, then Mrs. Brookings was entitled to one-half of the $300,000, and we rule that she is so entitled.

The trial court held that one-half of the $600,000 paid by the lessee as the replacement value of the building was the absolute property of the adult plaintiffs, and that the other half "is a part of the assets of the trust estate;" that the successor trustee, in its discretion, had power to expend the one half of the $600,000 in the erection of a new building on the premises occupied (until razed) by the old building, *provided* the owners (adult plaintiffs) of the other half "contribute their proportionate part." It was further held that in the event a new building was erected, and that one-half the cost thereof was less than $300,000, then the remainder would be held by the successor trustee "as a part of the *corpus* of the trust estate," and invested in designated securities and the net income derived therefrom paid to Mrs. Brookings during her life; that in the event a new building was not erected, then the successor trustee was directed to invest and reinvest the one-half of the $600,000 in designated securities, and that should a new building be agreed upon after such investment, then the successor trustee was to sell the securities to raise the necessary money to pay for one-half the cost of the building.

It appears that the adult plaintiffs' half of the $600,000 is in the possession of the successor trustee as their agent, and Mrs. Brookings contends that the whole of the $600,000 is *corpus* and should be retained under the jurisdiction of the court until the successor trustee and the adult plaintiffs "agree to erect a new building," or that the adult plaintiffs be required to give bond, before the one-half of the $600,000 is turned over to them, conditioned that the one-half of the $600,000 will be available when the owners "decide that it is wise to erect a new building on said land."

William R. Cady, real estate officer of the successor trustee, testified that if the old building were still on the property, the rental value at the time of the trial (April 5, 1936) would be about half of what it was at the time of the execution of the lease (February 28, 1930); that in the situation existing at the time of the trial, "it would be very difficult to rent to anyone." Counsel do not direct us to any authority, and we find none that would authorize the holding, as Mrs. Brookings contends, of the half of the $600,000, or the giving of the bond as she contends. The trust will terminate upon the

death of Mrs. Brookings. It is conceded that the adult plaintiffs and the successor trustee were tenants in common of the old building and the lot it occupied. If so they are such tenants of the $600,000. Partition, so to speak, has been effected as to the building, and in the situation it would be unreasonable to hold the $300,000 belonging to the adult plaintiffs, pending such an uncertain contingency as is suggested.

The judgment should be reversed and cause remanded with direction to so modify the judgment as to hold that Mrs. Brookings is entitled to have and receive one-half of the $300,000 paid by the lessee for the cancellation of the lease. It is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.