ISABEL VALLE BROOKINGS, Appellant, v. MISSISSIPPI VALLEY TRUST COMPANY, Successor Trustee Under The Will of JEMIMA LINDELL, Deceased, ROBIN ARTHUR LANG, JOHN ALEXANDER FORBES-LEITH, ANDREW GEORGE FORBES-LEITH, ANNE ROSEDEW FORBES-LEITH, and MARY ELIZABETH FORBES-LEITH, Minors, CHARLES DOUGLAS CONYERS LANG, ROBERT IAN ALGERNON FORBES-LEITH, and LORNA MARSALIE PRIOR.—No. 39571.—196 S. W. (2d) 775.

Division One, September 9, 1946.

Rehearing Denied, October 14, 1946.

*Luther Ely Smith, Harold C. Hanke* and *Victor B. Harris* for appellant.

*Charles P. Williams* for respondents.

 BRADLEY, C.—Action to construe the will of Jemima Lindell, deceased. The specific purpose is to require respondent Mississippi Valley Trust Company, successor trustee under the will, to charge taxes and other expenses of unproductive real estate against the corpus of the trust estate created by the will, and not against the income derived from trust property as a whole. Plaintiff (ap-

pellant) has a life estate in the net income of the trust property. There was a suit commenced by Sylvia, Inc., a tenant of one of the unproductive parcels of real estate in the trust, for damages resulting from rain because of a defective roof. Appellant asked that the successor trustee be directed, should a judgment be obtained in that case, not to charge such judgment or any expenses incident thereto against the income of the trust estate. And appellant asked that $18,347.32, plus interest, paid out by the successor trustee for taxes, etc. on said unproductive real estate for the years 1938 to 1942, inclusive, be paid to plaintiff out of the corpus of the trust estate.

A fee was allowed appellant's attorneys. Also, allowance was made said attorneys for expenses incurred by them. The court directed that these items be paid "out of the income account of the trust." Appellant contends that the fee and expenses should have been charged against the corpus and not the income. The trial court denied all the relief sought and this appeal followed.

Jemima Lindell executed her will May 26, 1891, and a codicil was executed March 17, 1894. She died February 21, 1896; the will was probated in the probate court, St. Louis, February 26, 1896. After certain bequests, not involved here, testatrix devised the residue of her estate to Wilbur F. Boyle as trustee for the purposes named therein. Respondent Mississippi Valley Trust Company was named successor trustee in the codicil.

Appellant stands on these propositions: (1) That since the real estate held in trust was productive at the time the will was executed, and did not become unproductive until long after the death of the testatrix, taxes and other charges against the now unproductive real estate should be charged against the corpus of the trust estate and not against income; (2) that it was the dominant intention of the testatrix to provide a life income to a favored great granddaughter (appellant, 15 years old at the time of the execution of the will), hence the income of this great granddaughter should not be reduced by paying losses on unproductive real estate from the income of the trust.

Trustee Boyle was authorized by the will to sell trust property; to invest the proceeds in other property, real or personal; to make improvements, insure, etc.; to loan money of the trust estate; to lease the real estate for any period not exceeding 50 years; to collect rents, interest, dividends and other income. The power to sell trust property was not given to the successor trustee, but such power to it was specifically denied.

The will directed that the trustee pay out of the income all taxes, insurance, repairs, etc. and then pay for life 3/8 of the net income to Mary Louisa Forbes-Leith, a granddaughter; 1/8 for life to Ethel Forbes-Leith, a great granddaughter; 3/8 for life to Isabel Valle January (appellant), a great granddaughter; 1/8 for life "as long as

she remains unmarried" to Grace Valle January, widow of a grandson. Trustee Boyle had charge of the trust estate from the probate of the will until his death March 16, 1911. Upon his death respondent Mississippi Valley Trust Company took over as successor trustee.

At the time this cause was filed, because of the happening of contingencies as to survivorship, only one half of the trust estate remained in the possession of the successor trustee. The other half, free of the trust, had theretofore vested in respondents Robert Ian Algernon Forbes-Leith and Lorna Marsalie Prior. Upon the death of appellant, the trust will terminate, and if she dies without issue living, or a living descendant of issue, then the half now held by the successor trustee will vest in respondents Robert Ian Algernon Forbes-Leith and Lorna Marsalie Prior, or their descendants, per stirpes. At the time of the trial appellant was 68; her expectancy was 9.47 years. She has had no children. Both Mr. Forbes-Leith and Mrs. Prior, brother and sister, have children who are the minor respondents here.

Among the assets of the trust estate is an undivided one half interest in 5 parcels of real estate in St. Louis, and for the last several years there have been no returns of consequence to the trust from this real estate. For the most part the expenses, taxes, etc. on this real estate have exceeded the returns. The 5 parcels are situated as follows: (1) A vacant lot (termed a hole in the ground by appellant) on the northeast corner of 12th and Washington; (2) a parking lot at the southwest corner of 10th and Lucas; (3) a 5-story building at 1101-1103-1105 Washington; (4) a 7-story building at 1107-1109-1111 Washington; and (5) a vacant lot on Natural Bridge Boulevard.

In addition to the one half undivided interest in the real estate mentioned there is in the trust estate about $675,000 in personalty. By the terms of the trust all expenses are deducted from the income as a whole, hence when the real estate is not self sustaining the burden falls on the income derived from the personalty. The net profit on real estate rentals for the years 1890-1897 were as follows:

```
1890....profit ...............................$21,320.36
1891....profit ............................... 23,061.02
1892....profit ............................... 18,416.40
1893....profit ............................... 26,213.08
1894....profit ............................... 8,558.91
1895....profit ............................... 3,805.91
1896....profit ............................... 11,861.37
1897....profit ............................... 2,952.65
```

Sometime around 1900 the lot at the northeast corner of 12th and Washington (parcel 1) was leased for a term expiring in 1923; an 8-story building (Carleton Building) was erected thereon which was occupied by the Carleton Dry Goods Company. The rental was $4,795 per month. At the expiration of the lease in 1923 it was re-

newed for a term expiring June 30, 1931, at an annual rental of $61,000. June 30, 1931, a new lease to a new lessee was made upon the Carleton Building and lot for a period of 49 years at an annual net rental of $75,000. The new lessee razed the Carleton Building and undertook the construction of a new 10-story building. Also, the city, about that time, was condemning property for widening 12th street, and took all of the Carleton Building lot from the west side of the building to the curb, that is, all the sidewalk; so the west side of the new building contemplated would be somewhat further east than the west side of the Carleton Building.

Financial difficulties came to the new lessee and bankruptcy threatened. November 27, 1935, an agreement was reached by which the 49 years lease was cancelled upon the lessee paying these items: $600,-000 replacement value of the Carleton Building; $231,250 rental from November 1, 1932, to November 30, 1935; $21,968.75 interest on delinquent rental; $6,974.81 taxes; $300,000 for cancellation of lease. Total, $1,160,013.56. And in addition to these cash items the lessee turned over 2,000 tons of steel purchased for the new building.

Over the years 1936-1942, both inclusive, the real estate as a whole showed a loss of $24,421.23, and all this loss, except $394.81, was sustained on parcel 1 on the northeast corner of 12th and Washington. However, for the year 1943, the real estate as a whole yielded a net income of $760.05. Some history, stemming from the trust estate created by the Jemima Lindell will, appears in Lang et al. v. Mississippi Valley Trust Company et al., 343 Mo. 979, 124 S. W. (2d) 1198, and it appears from that case that appellant received $150,000, the one-half of the amount paid for the cancellation of the new lease of June 30, 1931.

In January, 1942, remaindermen respondents in the present case brought a suit against the successor trustee and appellant here. The purpose was a court decree authorizing the successor trustee to sell a parcel of real estate at 13th and Washington in which the successor trustee held an undivided one half interest. The suit was based on the ground that the property had become unproductive and that it would be for the best interest of all concerned to sell. A decree was entered authorizing the sale. Appellant in the present case sought to make proof of this sale, but was refused.

The Sylvia suit, for rain damage and mentioned supra, had not been tried at the time the present cause was tried, but was tried after submission of the present cause ▇▇▇ and prior to the time the trial court made his decision. With her motion for a new trial appellant attached an affidavit which recited that a judgment was obtained in the Sylvia case against the successor trustee and others, and that the judgment had been settled. As a result of the settlement the successor trustee paid out $1,138.50, plus some costs, and this was charged against the income of the trust.

Also, the affidavit disclosed that after the trial and submission of the present case, an offer had been received by the successor trustee to purchase real estate parcels (3) and (4) for $125,000; that the successor trustee recommended acceptance to Mr. Forbes-Leith and Mrs. Prior, and that the offer has been accepted conditioned upon a court decree as in the sale of the parcel at 13th and Washington.

█ To support the proposition that since the real estate in the trust was productive at the time of the execution of the will, and did not become unproductive until long after the death of testatrix, taxes and other charges against the now unproductive real estate should be charged against the corpus of the trust, and not against income, appellant cites many cases. Among the cases cited are these: Harvard Trust Company v. Duke et al., 304 Mass. 414, 24 N. E. (2d) 144; Stone v. Littlefield et al., 151 Mass. 485, 24 N. E. 592; Haas et al. v. McGinn, 64 R. I. 133, 11 Atl. (2d) 284; In re Nirdlinger's Estate, 331 Pa. 135, 200 Atl. 656, 116 A. L. R. 1350; Hite et al. v. Hite et al., 93 Ky. 257, 20 S. W. 778, 19 L. R. A. 173, 40 Am. St. Rep. 189; Poole v. Union Trust Co. et al., 191 Mich. 162, 157 N. W. 430, Ann. Cas. 1918E, 622; In re Bothwell's Estate, 65 Cal. App. (2d) 598, 151 Pac. (2d) 298; In re Moore's Will, 185 Minn. 342, 241 N. W. 63. Also, appellant cites: Restatement, Law of Trusts, Sec. 233 (m); 2 Scott On Trusts (1939), Sec. 233.4; 26 R. C. L., p. 1383, Sec. 247; 20 Boston U. Law Rev. (1940), 447; 38 Mich. Law Rev., 1366.

█ After setting up the trust, etc. the will provides: "And such trustee shall, from time to time, as the same becomes due, collect and receive all rents, interest, dividends or other income proper from said trust property out of which he *shall* first pay *all* taxes, insurance, repairs and other charges and expenses upon said property or any part thereof, and the expense attending the execution of this trust, including compensation to said trustee; and he shall pay the net income remaining," as above stated. The language of the will denying to the successor trustee the power to sell follows: "The power and authority herein given said trustee to sell, purchase, or exchange real estate is personal to said William F. Boyle, and shall not be exercised by any successor to him in said trust" (italics ours).

In the Stone case, supra, it appears the trustee foreclosed a mortgage on land given to secure a note, a part of the trust estate, and became the purchaser at the foreclosure sale, we infer. After foreclosure, the trustee sold the land, but before selling, was compelled to pay back taxes, which the mortgagor should have paid. It was held that the life tenant was entitled to have the expenses of foreclosure deducted from the corpus and not from the income of other paying investments. In ruling the case the court said:

"The question is whether this expense for taxes shall be deducted from the principal, or be taken from the income of other and productive investments of the same trust estate. The tesator's widow being

522

entitled to the use and income of all of the residue of his estate, must that income bear the loss which may be sustained by reason of a particular unfortunate investment? We are of the opinion that it · must be deducted from the principal, otherwise a loss upon some one investment, for which one would be legally responsible, might absorb the widow's whole income for the year, or even more. It is more just that a loss of this description should be held to diminish the corpus of the trust estate, so that the life tenant will receive less income and the remainder man less principal.''

The Stone case does not rule nor does any other case cited, or that we find, rule that a court of equity may direct a trustee under such facts as in the present case to charge losses on unproductive real estate in the trust to the corpus and not to income where the will, as here, specifically directs that the trustee *shall* pay *all* expenses from income.

In Restatement, Law of Trusts, Sec. 233(m) is this: ''Ordinary current expenses as well as extraordinary expenses incurred in connection with unproductive property are payable out of principal, *unless it is otherwise provided by the terms of the trust*. Thus, taxes and other carrying charges on unproductive land are payable out of principal, even though the trust estate includes other property from which an income is derived, *unless it is otherwise provided by the terms of the trust*'' (italics ours). In the present case it is otherwise provided by the terms of the trust.

In 2 Scott On Trusts, Sec. 233.4 it is said: ''Where the trustee is by the terms of the trust directed to sell unproductive property, the courts have had no difficulty in holding that the carrying charges prior to the sale should be paid out of principal and not out of income received from the remainder of the trust property, unless a different intention of the settlor appears in the trust instrument. . . . On the other hand, where by the terms of the trust the trustee is directed to retain property even though it is unproductive, the inference is that the settlor intended that as long as the property is retained the carrying charges should be paid out of income. . . . The problem is more difficult where the settlor has made no provision with respect to the sale or retention of the unproductive property.''

In the present case the settlor, testatrix, did not say what should be done as to real estate expenses in the event the real estate became unproductive. All the cases cited by appellant turn on their own facts, but the facts in none of them are very similar to the facts here. There can be no doubt that courts of equity have ample power as to trust estates to prevent any grave injustice to a life tenant, but that does not mean that the plain language of the trust instrument will be disregarded respecting the expenses of the real estate in the trust. Certainly not under such facts as here.

 It will be noted, supra, that appellant was denied permission to make proof that in January, 1942, a parcel of the trust property at 13th and Washington was sold· by court direction on petition of the remaindermen. Also, it will be noted that in an affidavit attached to the motion for a new trial it was disclosed that an offer had been received by the successor trustee to purchase parcels (3) and (4) for $125,000, and that the successor trustee had recommended acceptance, and that the offer has been accepted upon condition. The fact that a parcel of real estate in the trust was sold by court direction on petition of the remaindermen, or that still other parcels may be so sold, would be no valid reason, under the facts here, to charge the expenses of an unproductive parcel of real estate to the corpus and not to income in direct violation of the direction of the settlor in the trust instrument.

"If the will is valid, a court of chancery may define, but cannot alter or enlarge, the powers conferred upon the trustee by the will. The court has also the power to do whatever is necessary to be done to preserve the trust from destruction, and in the exercise of this power it may, under certain unusual circumstances, modify the terms of the trust to preserve it but not to defeat or destroy it. Courts are slow to exercise their power even to modify the terms of a trust and will only do so when it clearly appears to be necessary." Stephens v. Collison et al., 274 Ill. 389, 113 N. E. 691, 1. c. 694. See also, Lyter et al. v. Vestal et al., 355 Mo. 457, 196 S. W. (2d) 769, handed down herewith.

There is nothing in the will or in the record suggesting that the testatrix had anything especially in view respecting appellant's income from the real estate in the trust. The record shows, however, that the income from said real estate·was generally substantial for some 40 years after the death of testatrix. But if it be assumed that testatrix did have in mind that the real estate she placed in trust for the benefit of appellant and others would continue to be productive for the life of appellant, it cannot well be said that such has not, in effect, been the case thus far, and bids fair to so continue during the life of appellant. It must be remembered that in the settlement in 1935, resulting in the cancellation of the 49 year lease executed in 1931, $300,000, one half of the replacement value of the Carleton Building, went into the trust for the benefit of appellant for life, and that she received outright $150,000, the one half of the consideration for the cancellation of the new lease in 1935, and received her part of the $231,250 rental and her part of the $21,968.75 interest on delinquent rental.

The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.