65 Cal.App.2d 598 (1944)
Estate of ALBERT J. BOTHWELL, Deceased. JOHN R. WHEELER, as Trustee, etc., Petitioner and Appellant,
v.
ADA BOTHWELL FISHER et al., Contestants and Appellants.
Civ. No. 14215. 
California Court of Appeals. Second Dist., Div. Three. 
Aug. 30, 1944.
 H. Sidney Laughlin for Petitioner and Appellant.
 C. C. Pease and William J. Currer, Jr., for Contestants and Appellants.
 SHINN, J.
 Two appeals are presented from an order settling the tenth account of a testamentary trustee. Appellants Ada Bothwell Fisher and Edith Bothwell Hale, adopted daughters of decedent, are entitled to receive the net income from the estate in trust--not all of it, but all that is involved in the matter in issue. The trustee took the trust property by decree of partial distribution in 1929. Among the assets were a ranch property in Colorado and bonds of several South American Republics. The Colorado property was kept until 1940, when it was sold for $14,000. While not entirely unproductive, it was held at a continuing loss to the trust, the carrying cost exceeding the income for the 11-year period by $3,734.90. These annual losses were reported by the trustee from time to time in his accounts as having been paid out of general income and all of the accounts but one were approved as presented. The South American bonds were sold in 1940 for $20,310.63. The trustee by his tenth account reported the amounts received for the Colorado land and for the bonds as capital of the trust. Appellants filed objections to the account, contending that such proceeds should have been apportioned between principal and income. The court rejected this contention but did charge the principal and credit the income account with the amount of the loss in keeping the Colorado land. The life beneficiaries appeal from so much of the order as refused apportionment as between principal and income, and the trustee appeals from that portion which charged the expenses of the Colorado land to the capital account. The questions upon the two appeals are interrelated. *601 For convenience we shall refer to the life beneficiaries as appellants and to the trustee appellant as trustee.
 Appellants relied below, and they rely here, upon principles which have been carried into the Restatement, Trusts, as follows:
 " 241. Allocation on Delayed Conversion."
 "(1) Unless it is otherwise provided by the terms of the trust, if property held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary is property which the trustee is under a duty to sell, and which produces no income or an income substantially less that the current rate of return on trust investments, or which is wasting property or produces an income substantially more than the current rate of return on trust investments, and the trustee does not immediately sell the property, the trustee should make an apportionment of the proceeds of the sale when made, as stated in Subsection (2)."
 "(2) The net proceeds received from the sale of the property are apportioned by ascertaining the sum which with interest thereon at the current rate of return on trust investments from the day when the duty to sell arose to the day of the sale would equal the net proceeds; and the sum so ascertained is to be treated as principal, and the residue of the net proceeds as income."
 "(3) The net proceeds are determined by adding to the net sale price the net income received or deducting therefrom the net loss incurred in carrying the property prior to the sale."
 Our own courts of review have not considered whether recognition should be given to the foregoing principles, although they are well established in other jurisdictions. (Lawrence v. Littlefield, (1915), 215 N.Y. 561 [109 N.E. 611]; Furniss v. Cruikshank (1921), 230 N.Y. 495 [130 N.E. 625]; In re Pinkney (1924), 208 App.Div. 181 [202 N.Y.S. 818]; 238 N.Y. 602 [144 N.E. 909]; In re Jackson's Will (1932), 258 N.Y. 281 [179 N.E. 496]; In re Satterwhite's Will, 262 N.Y. 339 [186 N.E. 857]; In re Lott's Will (1937), 251 App. Div. 333 [296 N.Y.S. 43]; In re Chapal's Will (1936), 269 N.Y. 464 [199 N.E. 762, 103 A.L.R. 1268]; Hagan v. Platt (1891), 48 N.J.Eq. 206 [21 A. 860]; Equitable Trust Company v. Swoboda (1933), 113 N.J.Eq. 399 [167 A. 525]; McCoy v. McCloskey (1922), 94 N.J.Eq. 60 [117 A. 473]; In re Nirdlinger's *602 Estate (1938), 331 Pa. 135 [200 A. 656, 116 A.L.R. 1350]; Springfield Safe Deposit & Trust Co. v. Wade (1940), 305 Mass. 36 [24 N.E.2d 764]; 2 Scott on Trusts, p. 1354; 4 Bogert, Trusts and Trustees, 825; 4 Univ. of Pittsburgh L.Rev. (1937-38) 82; 36 Mich.L.Rev. (1937-38) 340. See, also, Annotation 103 A.L.R. 1271 and supplemental annotations 115, page 881; 116, page 1354; 129, page 1314, and 142, page 264.)
 The doctrine of apportionment originated in the courts of England, where it was accepted as a satisfactory means of adjusting the rights of income beneficiaries and remaindermen in case of failure to make sales as directed. As approved in the above cited cases and as adopted in the Restatement it has application to all cases in which a postive duty to sell property exists and there has not been an immediate sale, whether the failure to sell is inexcusable or is due to the exercise of the trustee's sound judgment to postpone selling because of adverse market conditions. (Restatement, 241 [Comment b hereinafter quoted].) It is well settled in the jurisdictions where the doctrine of apportionment has been considered that it should be applied whenever necessary in order to give full effect to the provisions of the trust. In arriving at the intentions of the trustor the doctrine of equitable conversion is often an important factor. Manifestly it is less difficult to understand the wishes of a trustor where he has imposed upon his trustee a duty to sell and to reinvest for the benefit of life beneficiaries than where he has vested him with authority to sell but has given no mandatory directions. Here the duty to sell was mandatory and there is no question as to the time when payment of income to the life beneficiaries was to commence. [1] The decree of partial distribution read in part as follows:
 "That said executor and executrix forthwith delivered to Elizabeth Word Wheeler the property and effects hereinafter specified in trust, however, upon and for the uses and purposes and with the powers following, that is to say:"
 "To convert the same into interest bearing securities such as are authorized by law for the investment of trust funds, with power to vary such investments at her discretion, and after deducting the lawful charges and expenses of managing the trust, but not including therein any charge for the personal services, to pay to [here follow provisions for payment of all net income]."
 Such directions are construed as mandatory and they express *603 an intention to effect an equitable conversion. (See cases cited above; Restatement, Trusts, 131.)
 In order to give effect to the direction to sell, the Colorado land must be deemed to have been sold as of the date when the duty to sell arose, and this was the date of the decree of partial distribution. It clearly appears that the life beneficiaries were intended to receive income upon the entire estate, and this can be accomplished, under the circumstances, only by paying them from the proceeds of the sale an amount equal to the income which would have been available to them if the trustee had been prompt in making the conversion.
 It is earnestly insisted by the trustee that there is no precedent in California for the use of the doctrine of apportionment, and that if it be conceded that it is sound in principle, its application would be inequitable except under extreme conditions. He says: "In order to take from the corpus and give it to income the Court must have the best of reasons, for to take such a step is, in effect, to reverse all the tenants (sic) of trust administration, the very root of trust law. To say that any such rule is operative at all or operative under certain conditions must rest, we are persuaded, upon which of the two parties is to be sacrificed, the beneficiaries or the remaindermen. It would seem that justice would rest with the remaindermen for if the corpus is lost to them in any amount, it can never be replenished, while if income is not for a time earned on some particular portion of the trust property, it is only to that extent lost. Further, the remaindermen must wait years before they take the value of their provision, and that without increase or addition, while the beneficiaries take their interest at once and continually during their life. Where is the justice of the rule then, under such facts as obtain here, or indeed generally? Under particular circumstances such as a trust estate having but one parcel of property and that unproductive, and the benficiaries of the income having received no income whatever from the inception of the trust, it might be reasonable to say that the rule would operate if the remaindermen had benefitted in any manner by the failure of the trustee to sell, that is, by increase in value or some such fact. But to apply the rule under circumstances that can only injure the estate of the remaindermen, depreciate it without hope of recovery, is a poor rule. In any event, it has never been applied in this state, not even discussed so far as has been ascertained by diligent research. *604 "
 "If this rule should be adopted in this state, then our whole present system of trust law is thrown out of gear and a new system will gradually come into effect erected piecemeal by a series of decisions construing the new rule under various factual circumstances. Undoubtedly any change in the present system will effect many trust estates now being administered as well as many other decedents' estates which have not yet reached the trust stage. In all trust estates in which the beneficiaries of the income are separate and distinct from the remaindermen the trustee stands between the two extremes of personal desire, those who want income at the expense of the remaindermen, and those who want safety of the corpus at the expense of large income. The inaugurate this rule immediately places in the hands of the beneficiaries of income the weapons of a road agent with which to hold up the remaindermen and take from him what both the trustor and the present law says is his. It takes no imagination to foresee the resultant litigation."
 The argument does not recognize that there are limitations within which trustees and the court must keep in the administration of trusts. [2] The plan of the trustor must be followed. It may not be departed from in particulars wherein it is specific, merely because it may be considered in those particulars to be unwise. The trustee cannot substitute his own plan because he thinks it is a better one, and if he does the court should not approve his action to the prejudice of any beneficiary, even if it has operated to the general advantage of the estate.
 The doctrine of apportionment is but one of many rules which have been developed for the administration of trusts, whereby effect is given to the expressed directions of the trustors. It has never been questioned in California that the controlling consideration in the administration of wills and trusts is the duty to ascertain the purposes of testators and trustors and, having ascertained them, to see that they are duly carried out. The question whether the courts of California should accept the doctrine of apportionment as a sound one, and follow it, is answered affirmatively if, in a given case, its use is the most appropriate means for the accomplishment of the purposes of the trustor. There is in reality no conflict of authority upon the proposition that the directions of the trustor are controlling. Where apportionment has been refused it has been upon the ground that it was unnecessary in order to carry out the trustor's plan. The Restatement *605 undertakes to state the better practice in situations where there has been a lack of uniformity in applying the general rule, and we shall notice some of these later. [3] Where an equitable conversion of realty to personalty has been effected by the terms of the trust instrument and the life beneficiaries have been deprived of income through the failure of the trustee to sell the realty, apportionment of the proceeds of sales would seem to be the most fair and logical method of securing to them the benefits which the trustor intended them to receive. They may have other redress by taking steps to compel action by the trustee or they may hold him responsible for their loss of income due to his neglect, but the right to compel the trustee to act is not a substitute for the right of apportionment, and the assessment of damages against a trustee for negligence is a remedy which we think should not be resorted to when another appropriate one is available.
 It is stated in respondent's brief that the trustee exercised good business judgment in holding the land because market conditions were unfavorable and a rise in prices was reasonably to be expected. This appears not to have been an issue in the present controversy although it may have been in former contests and we assume that it was. But it is too clear for argument that the land could not be held at a loss of income to the life beneficiaries without doing violence to the mandatory directions of the trustor. In settLing the tenth account the court should have made an apportionment between principal and income according to the formula approved by the Restatement. [4] The next question is as to the date from which income should be computed. The rule of the English cases and some of the early American cases allowed a year for the conversion. In the leading case of Lawrence v. Littlefield, supra, 215 N.Y. 561 [109 N.E. 611], it was held that income should be computed from the date of death where executors had been directed to sell the residue of the estate. It was there said (109 N.E. p. 618): "When the doctrine of equitable conversion is held to be applicable as in the present case operating to change real estate into personalty, it is followed out for all purposes of the will." This rule is given approval in the other cases and in the text books we have cited. It is stated in 4 Bogert, Trusts and Trustees, pp. 2401-2, section 825: "While the settlor cannot be deemed to have expected an immediate sale, since he must be held to have foreseen the necessary delay, he can reasonably be held to have *606 intended that the rights of life cestui and remainderman shall be adjusted, after the sale, as nearly as possible as they would have stood if a sale had occurred on the day when the trust started and an immediate investment of the sale proceeds had then been made. The court so interprets his direction to convert. Such direction carries along with it an understanding that the income and expenses pending conversion and the proceeds of conversion shall be allocated so as to bring the life tenant and remainderman as nearly as may be into the same economic position that immediate conversion would have involved." Under the rule of the Restatement, no time is allowed for conversion if a theoretical immediate conversion will accomplish what the testator intended. This rule is not inconsistent with the laws or decisions of our state and it leads to a fair settlement of the matters in controversy. One of the principal purposes of the Restatement is to endorse what is considered to be the sounder of conflicting common-law rules, and this effort toward simplification and uniformity has been given wide recognition and support by the courts. The present case is one which calls for approval of a definite and general rule for the guidance of trustees in similar situations, namely, where the trust instrument expresses an intention to effect an equitable conversion of realty into personalty. In the Restatement the date which is accepted as controlling is the one on which the duty to sell arose, which, in our case, was August 28, 1929, some fifteen months after the testator's death. This date is the proper one to use in the instant case because the direction to sell was imperative and worked an equitable conversion. It was stipulated that a going rate of return on trust investments through the period in question was 4 per cent. From the proceeds of the sale there should be allocated to principal an amount which with interest at that rate from the time of the decree of partial distribution would equal the proceeds of the sale at the date thereof and the remainder should be allocated to income.
 [5] While we are satisfied that the proceeds of the sale of the land should be so apportioned, our holding is not to be construed as endorsing its use in all possible cases. The initial phrase of section 241 of the Restatement, "unless it is otherwise provided by the terms of the trust" states a qualification which makes it necessary for the court to construe the directions of the trustor upon a consideration of the facts of the particular case. The rule of apportionment may not be employed *607 to add terms to the trust instrument but only as a means of giving effect to those stated. If the purpose of the trustor is discerned to be such that it would be added to, interfered with or defeated rather than given effect by apportionment, the division of the proceeds of sales between capital and income would be not only unnecessary but also unjustified. In a note in 103 A.L.R. page 1279, under "Allocation Held Improper," cases are listed in which apportionment was not allowed because the terms of the governing instruments were held to negative the idea that the beneficiary was intended to enjoy what was referred to as "notional" income in Martin v. Kimball (1916), 86 N.J.Eq. 10 [96 A. 565]; affirmed 86 N.J.Eq. 432 [99 A. 1070]. See, also, A.L.R. annotations, supra.
 The land in question here had a considerable value. The principal of the estate now is around $85,000. Fourteen thousand dollars, at 4 per cent interest, would have returned the life beneficiaries a substantial amount of income. There is nothing in the terms of the trust to indicate that the trustor did not have this land in mind when he gave the trustee directions to sell his property. Upon the contrary, it would appear from the unconditional nature of the directions that he intended his daughters to have the income that would be returned by the investment in sound securities of the proceeds of the sale of the land. We are not approving the rule of apportionment as one to be employed indiscriminately but because the protection of the substantial rights of the life beneficiaries, as established by the decree of partial distribution, calls for its application.
 [6] The next question is the one raised on the appeal of the trustee from the provision of the order charging back the expenses to principal. In his successive accounts the trustee charged the net loss in carrying the Colorado property to the general income, and the orders approving the accounts have approved such charges against income, with the exception of the ninth order which charged taxes and certain other carrying charges to principal. These orders have become final. The expenses and carrying charges of the land in excess of the income from the land should have been charged to principal from the beginning. They were not chargeable to income where the trustee was under a duty to sell the land and where it was not only unproductive of any net income but also entailed a steady loss. Where a testator or trustor has intended *608 to effect an equitable conversion, carrying charges of the realty before the conversion should be paid from principal. (Furniss v. Cruikshank (1921), supra, 230 N.Y. 495 [130 N.E. 625 at 630]; Spencer v. Spencer (1916), 219 N.Y. 459 [114 N.E. 849]; In re Jackson's Will, supra, (1932), 258 N.Y. 281 [179 N.E. 496]; In re Satterwhite's Will, supra, (1933), 262 N.Y. 339 [186 N.E. 857]; In re Lott's Will, supra, (1937), 251 App.Div. 333 [296 N.Y.S. 43]; Hite v. Hite (1892), 93 Ky. 257 [20 S.W. 778, 40 Am.St.Rep. 189, 19 L.R.A. 173]; 40 Yale L.J. (1930-31) p. 277.) Comment d under section 241, Restatement, reads as follows:
 "Addition of income and deduction of expenses. The proceeds of the sale of property which the trustee is under a duty to sell plus the net income, if any, from the property received by the trustee or minus the net loss, if any, in carrying the property prior to the sale, is treated as containing permanent principal and income on the permanent principal at the current rate of return on trust investments."
 "If any net income received has been paid to the life beneficiary before the sale, the amount so paid will be deducted from the amount which he would otherwise receive on the sale; and conversely, if the carrying charges have been paid out of income, the amount so paid will be added to the amount which the life beneficiary would otherwise receive on the sale."
 [7] Under this rule, in applying the doctrine of apportionment, there should be allocated to the income account the total of the amounts that have heretofore been charged against income as carrying charges of the land. To charge back these expenses to principal does not satisfy the right of the life beneficiaries to apportionment, for they still would suffer loss of income for eleven years. The trustee attacks the charging back of these amounts upon the ground that they have heretofore been charged to income and that the orders approving such charges have become final and are not subject to modification. The answer to this contention is that we are considering only an apportionment of the proceeds of the sale, and in that connection the former orders are not conclusive as to the right or the basis of the apportionment. The right to apportionment upon an equitable basis did not arise until a sale had been made, and the respective orders settling the accounts did not purport to and could not determine matters of right between the life beneficiaries and the remaindermen with respect to the account to which the expenses should be *609 charged if apportionment should be had. Questions involving those rights remained in abeyance until the property had been sold. The rights of the beneficiaries to apportionment were not lost merely because they were not asserted before the property was sold.
 [8] However, the fact that the practice of the trustee of charging the expenses to income was sanctioned by the several orders approving the earlier accounts presents another question for consideration by the court when the matters in issue are retried, namely, whether the conduct of appellants may have been such as to estop them from now demanding that the cost of carrying the Colorado land should be added to their income account in apportioning the proceeds of the sale. It does not appear whether appellants ever objected to the charging of the expense to income. We may assume it will appear upon a retrial that appellants have had notice of the filing of all accounts and have known that the carrying charges have been paid from income. Accountings are an invitation to all interested parties to object to the manner in which a trust is being administered, and the failure to object amounts to passive acquiescence. Appellants have at all times had the right to apply to the court for an order requiring the trustee to sell the land. Upon the other hand, the remaindermen, presumably knowing that the carrying charges were being paid out of income, have taken no steps, so far as the record shows, to cause the land to be sold. If upon objection to the accounts the expense had been charged to principal, they might have insisted upon a sale of the property when they learned that they would have to pay it. We are not suggesting that the mere silence of appellants would deprive them of the right to have the amount of the carrying charges returned to the income account upon an apportionment, for there are other essential elements of the doctrine of estoppel in pais, but it is conceivable that their conduct may have been such as to render it inequitable to impose the whole burden of carrying the property upon the estate in remainder. All the facts would have to be developed before the court could determine whether the doctrine of estoppel in pais is available to the remaindermen in opposition to the claim of appellants that in the apportionment of the proceeds of the sale the amount of the carrying charges should be restored to the income account. *610 We think we should not direct that the amount involved be apportioned upon a record which does not show the facts bearing upon the questions of estoppel or laches, as to the merits of which no inference should be drawn from the fact that we mention them.
 [9] The South American bonds were sold for $20,576.88. They were of seven different republics, states, departments, and municipalities of Brazil, Colombia, Bolivia, and El Salvador. All of them had been in default in the payment of interest since either 1931 or 1932. One group bore interest at 7 per cent, one at 7 1/2 per cent, and the remainder at 8 per cent, with the exception of a refunding issue at 4 1/2 per cent. Under principles that have been stated heretofore, it became the duty of the trustee to sell the several groups of bonds as they fell into default. Under Comment b, section 241, Restatement, Trusts, we find the following:
 "The rule stated in this Section is also applicable where, although the trustee was not at the outset under a duty to sell the property, it subsequently became his duty to sell, whether the property was originally received by him as part of the trust estate or was subsequently acquired by him (see 231). In this case the beneficiary is entitled to income calculated from the time when the duty to sell first arose, although the trustee properly postpones the sale because the sale could not be effected immediately without undue loss to the trust. Thus, where trust property which is reasonably productive subsequently becomes unproductive, as for example if shares cease to pay dividends or a house can no longer be rented, and in the judgment of a prudent man it appears that the property is likely to continue unproductive, the trustee is under a duty to the life beneficiary to sell it and invest the proceeds in productive property; and although he may properly postpone the sale, when the sale is made the beneficiary is entitled to income from the time when the duty to sell first arose, in accordance with the rule stated in this Section."
 The sales were made at different times during 1940. Appellants contend that the net proceeds of the sales should be apportioned between principal and income. There are different methods of calculating the amount of the proceeds of the sale of securities which represents income. Under the method contended for by appellants, the amount of interest due on the security, at the rate stated therein, is added to the unpaid principal of the obligation; the proportion which the *611 balance of principal bears to this total represents the proportion of the net amount received on the sale which goes to principal and the balance goes to income, that is to say, if the unpaid interest amounts to one-half of the principal obligation, the amount received is allocated two-thirds to principal and one-third to interest. This is the method followed in New York and some other jurisdictions. In Pennsylvania and Massachusetts the method is followed which we have quoted from the Restatement. Under this method the share which goes to principal is a sum which, with interest at the current rate of return on trust investments from the date when the duty to sell arose, would equal the amount of the sale at the time of sale. The Restatement recognizes but one method of apportionment, whether the sale be of securities or of other property. This method is the better one to use in the instant case. The life beneficiaries should be allowed as income the amount, without interest, which they would have received if the trustee had sold when the duty to sell arose and had invested the proceeds in sound securities at a rate of return which the parties here agree would have been 4 per cent. There is no good reason why they should receive more than that in an apportionment. The South American bonds were not sound securities and they were encompassed within the general directions to sell. The interest rates were abnormally high according to our standards. Under the express terms of the trust the bonds should have been sold and the proceeds invested in interest-bearing securities such as are authorized by law for the investment of trust funds. That was not done for eight or nine years after the bonds were in default. It is true that theoretically it may be said that when they were sold the same percentage was paid on the face amount of the unpaid coupons as upon the principal obligation, which, generally speaking, is the basis of the method of computation contended for by appellants. But to apply that method, which would take into account an abnormally high interest rate on an investment intrinsically unsound, would be illogical where the bonds have been sold at a great loss. The facts of the present case demonstrate the wisdom of following the single method of computation which is given approval in the Restatement. The doctrine of apportionment is equitable and practical and the problems involved will be much simpler for the courts, and for trustees as well, if it is kept in mind that an *612 equitable result will be reached by treating as having been done that which should have been done, whether interest-bearing securities or other property be involved. An apportionment should therefore be made which will give the income beneficiaries an amount which they would have received at 4 per cent interest if the several holdings had been sold when the respective defaults first occurred, at the prices which they actually brought upon the later sales.
 [10] The bonds were sold for less than their value as fixed by the court in the settlement of the ninth account. The trustee was allowed credit for the loss and appellants seek a reversal of the order as to this credit. Their theory is sufficiently explained in their opening brief, as follows: "By their exceptions to the Ninth Account, the appellants elected to treat the unauthorized South American bonds as property of the trustee, subject to an equitable lien in favor of the trust at the value established by the Court in the findings of fact entered pursuant to those exceptions. The effect of that decree under these authorities was to cause the trustee to be charged with the sum of $24,275 ["Exhibit B"], which sum was secured by the South American bonds. The trustee was entitled to sell those bonds at any price he could obtain, and pay the proceeds into the trust. The difference between the amount paid in and the amount of their value must be made up by the trustee out of his own pocket. ..." The contention is without merit. There is nothing in the record to show that in the contest over the ninth account appellants sought to have the trustee charged with the value of the bonds as so much cash on hand, owing to the estate, because of his neglect to sell them. Even if it would have been proper to order the beneficiaries to transfer their interests in the bonds to the trustee, to charge the trustee with their value, and to impress a lien on the bonds for the amount (Estate of Hamon (1922), 60 Cal.App.154 [212 P. 399]), the court has ruled otherwise in settling the ninth account. It appears that in the settlement of that account the trustee was found to have been negligent in failing to sell the South American bonds and was surcharged with a loss of income in the amount of $322.49 for the current accounting period. The order read in part: "That said trustee at the close of the accounting period, to wit, December 31, 1939, is chargeable with assets belonging to said trust in the sum of $77,327.28, consisting of the following properties: ... South American Bonds (Parcels 1 to 9) *613 $24,275.00 [other assets listed and described]." Under this order the bonds remained in the ownership of the trust until they were sold during the tenth accounting period.
 [11] In the settlement of the tenth account, the court made the following finding, although it was included in the conclusions of law and consisted in part of conclusions: "That certain South American bonds described in the ninth account current of the trustee were sold by him at a loss of three thousand five hundred forty-eight dollars and twelve cents ($3,548.12), which loss was not in any manner caused by any negligent act on the part of said trustee and that said trustee should not be surcharged in his accounts therefor or for any part thereof, but that the whole of said loss should be allowed as a credit to the trustee and charged to the principal of said trust." The evidence was that the trustee used diligence and discretion in making the sales and received the highest prices obtainable. It is unnecessary to mention any of the historical events of the year 1940 which depressed the market for the bonds. There was no evidence which tended at all to show negligence in making sales. The trustee was properly allowed credit for the loss sustained.
 [12] We have considered appellants' objections to items in the account respecting fees to the trustee and his attorney during the accounting period. The amounts allowed were not disproportionate to the value of the services rendered, as disclosed by the evidence. If the trustee had been guilty of negligence during previous accounting periods such as would have affected his right to receive compensation, consideration of that question now has been foreclosed by the approval of the former accounts, including the ninth. There was no evidence of negligence or breach of duty during the tenth accounting period. The court acted within its discretion in allowing fees to the trustee for his services and those of his attorney.
 The order is reversed for further proceedings in the matters involved on the appeals in accordance with the views herein expressed.
 Desmond, P. J., and Wood (Parker), J., concurred.
 A petition for a rehearing was denied September 29, 1944, and the following opinion was then rendered:
 THE COURT.
 Upon application for rehearing it is asserted that it was developed in earlier proceedings in the *614 administration that the Colorado land was under lease at the time of the testator's death and at the time of distribution, for a rental consisting of one-half of the calves produced on the ranch throughout the term of the lease. Evidence of that fact would present a question for the trial court which was not presented to this court upon the appeal. We think it would be proper for the court to consider the terms of the lease and the interests of the estate thereunder in fixing the time when the duty to sell arose. If the circumstances were such as to indicate that it was the intention of the testator that the land be held until the lease expired it would be proper to fix that date, or any earlier termination of the lease, as the one when the trustee should have made a sale. If the court should find that the testator did not intend that a sale of the land be postponed until the termination of the lease, the date when the duty to sell arose should be taken as the date when distribution was made, which we understand was by final decree of distribution, although the South American bonds were distributed on a partial distribution.