In re Estate of Sells: VOLKEMA, Exr., Appellant, *v.* HANOVER et al., Appellees.

(No. 8987—Decided July 2, 1968.)

*Mr. Lawrence A. Ramey,* for appellant.

*Mr. Theodore L. Horst* and *Mr. Collis Gundy Lane,* for appellees Ruth D. Hanover and Allen Lester Sells, individually and as trustees under the will of Amaziah H. Sells, deceased, Florence G. Bishop, Dick H. Sells, Dan B. Sells, Nancy L. Hovey, Blanche Sells Geideman, Marjorie J. Hounsell and Frances Le Master.

*Mr. Willard Dobbs,* for appellees Joe D. Sells and Francis T. Sells.

*Mr. Dale Hildebrand,* for appellee James L. Myers.

*Mr. John Jeisel III,* for appellee Joyce F. Myers.

TROOP, J. Amaziah H. Sells died testate August 10, 1951, leaving a surviving widow, Eda Sells, his second wife, who died October 14, 1961. Fourteen children were born to Amaziah Sells and his first wife, who were named beneficiaries in his will along with the widow, Eda Sells. A testamentary trust was created under the will. During the administration of the trust, attempts were made by Eda Sells to require the sale of a farm of 151 acres, in northern Franklin County, and to secure the removal of two trustees who were, with her, the trustees under the testamentary trust.

After the death of Eda H. Sells an action for a declaratory judgment was brought by the personal representative of Eda H. Sells, the executor of her estate, against thirteen surviving sons and daughters of Amaziah H. Sells and the estate of a deceased daughter. The petition, filed October 4, 1962, alleges the testamentary trust and the fact that the 151-acre farm was the significant asset in the trust estate which was valued in the trust inventory at $60,000 and which, it is claimed, increased in value during the life of the trust to $253,000. Further allegations noted are the assertion that the rate of return on the farm property was below the average return on trust investments during those years, a claimed dispute between Eda

Sells and her co-trustees as to the sale of the farm resulting in an action in the Probate Court, that the controversy persists, and that the rights of the deceased Eda Sells, ignored during her lifetime, continue to be thrust aside.

Some incidental allegations may be important. The required division of trust income, two-thirds to Eda Sells and one-third to the children of Amaziah Sells, or their heirs, is noted. Eda Sells sought to increase her life income by the sale of the farm and an allocation of a portion of the proceeds to accomplish an increase in income to the widow. A formal demand was made upon the co-trustees, Ruth D. Hanover and Allen Lester Sells, daughter and son of the settlor of the trust, without result. The co-trustees were against the sale of the farm and contended that even if it were sold there was no duty to allocate because any increase in value accrued to the benefit of the remaindermen and that, accordingly, they intend to distribute the trust assets or the proceeds of any sale to themselves and their brothers and sisters, or their heirs.

There are a number of detailed requests made in the prayer for a declaratory judgment, lettered (a) through (k) in the petition. Reference is to the petition for the detail. Essentially, the plaintiff seeks to have the farm found to be underproductive trust property in failing to return a normal rate of 6 per cent and that it should have been sold, with Eda Sells, during her lifetime, having a right to have the proceeds from a sale apportioned to her so as to produce income. It is also contended that such right survives Eda Sells's death. Further, the petitioner asks that the trust be terminated, allocation and distribution made, and, to facilitate such procedure, that the recalcitrant surviving trustees be removed.

The record in the trial court was made before a referee November 23, 1964. An entry filed December 11, 1967, found the general referee's report, noted as dated June 16, 1965, to be correct and approved it along with the order of the referee on the motion for a new trial made August 19, 1965. The motion for a new trial was overruled, the relief prayed for by the plaintiff denied, and the petition dismissed. In the judgment entry the court found the trustees

without authority to sell the real estate held in trust without the approval of more than one-half of the holders of the distributive interest in the real estate, who are the children of Amaziah Sells, or their heirs.

This appeal on questions of law is from the December 11, 1967, judgment and final orders.

Reference in this discussion is to the estate of Eda H. Sells, deceased, as plaintiff, and to the children of Amaziah H. Sells, or their heirs, as defendants. Facts found by the referee are detailed in a report dated June 16, 1965, and a part of case No. 154,028 in the Probate Court. Some of the cases considered in this review are listed at the close hereof and reference will be to the case by letter as shown in the schedule. The appellant, plaintiff in the trial court, outlines rather minutely fifteen assignments of error. The approach in the consideration of the objections raised will be to give attention to what appear to be fundamental principles bearing upon the problems presented, rather than an attempt to discuss each assigned error in detail. A topical division is suggested in the hope that the discussion will be orderly, avoid too much overlapping, and be comprehensive without being verbose. The topics are as follows:

1. The Testator's Intent.

2. The Trustees' Power to Sell the Trust Asset.

3. The Conflict of Interests Among Trustees as Bearing on Possible Removal.

4. The Significance of an Underproductive Asset.

5. A Right to Apportionment and the Possibility of Such Right Becoming a Vested Interest.

6. Possible Estoppel.

Basic to the entire consideration is the will of Amaziah H. Sells. Certain parts of the will have particular significance for this review. The will is considered in its entirety—from its four corners—but selected portions are as follows:

"ITEM II. I direct that my wife, Eda Sells, shall have the right to live in our home so long as she may live and remains unmarried.

"ITEM III. I direct that my daughter, Ruth D. Han-

over, shall have the right to live in our home as long as she may desire to do so.''

Item IV is long and detailed. In it, testator first directs the payment of his debts and then gives the remainder of all his property, of whatever kind, in trust to his widow, Eda Sells, his daughter Ruth D. Hanover, and his son Allen Lester Sells, as trustees. And then the testator speaks, as follows:

''It being my desire that, after my death, my estate be held intact until such time as it may, in the judgment of my Trustees, be disposed of to the best advantage and for the benefit of all of the beneficiaries of this Trust, I direct that my Trustees hold, manage, control, invest and reinvest the property at any time forming a part of the trust estate with all of the rights and powers hereinafter granted to said Trustees and subject to the restrictions hereinafter imposed.''

Distribution of the net income from the estate is specified in Item IV. Two-thirds of it was directed to be paid to Eda Sells in quarterly installments ''so long as she may live and remains my widow,'' and the remaining one-third paid to his fourteen children, or their heirs, each a one forty-second (1/42) part of the net income, in annual installments.

The item continues and directs that if the trustees shall determine that it would be an advantage to the estate to sell ''the trust property,'' ''they shall notify the beneficiaries—that is to say, my children or their heirs—, by registered mail.'' And then the following language appears:

''If beneficiaries entitled to more than one-half of the distributive interests approve of said proposed sale in writing the Trustees shall proceed to sell the trust property and distribute the net proceeds thereof or, in the event all of the beneficiaries so request in writing, distribute the corpus of the estate,—that is to say, the trust property or any part thereof,—as follows:''

The direction which follows requires that two-thirds of the proceeds of any sale shall be held by the trustees and invested for the benefit of Eda Sells during her lifetime,

and upon her death, or in the event she is not living at the time of the testator's death, "* * * said one-third part of my estate shall be distributed to my children and their heirs, devisees or legatees as hereinafter provided." (Note, the one-third recited is obviously an error, two- thirds having been allocated for the benefit of the wife.) The "hereinafter provided" directs equal distribution to fourteen named children and to their heirs.

Item IV further provides that if the "trust property" is not sold before June 1, 1972, "upon the request of beneficiaries entitled to one-half or more of the distributive shares" the "Trustees shall immediately proceed to advertise and sell" and distribute the proceeds as therein provided. It is further provided that with written permission of more than one-half of the distributive shares the trustees may "subdivide and develop," etc., the farm property.

On pages 5 and 6 of the will, the trustees are given broad general powers as to personal property, and there follows an assortment of powers over the many facets present in estate management, curtailed only by specific limitations contained in the will and the law generally.

Finally, noted on page seven of the will, as follows:

"The Trustees shall have full power and authority in their absolute and uncontrolled discretion to determine all questions as to apportionment of receipts and disbursements between principal and income * * *."

The will of Amaziah Sells is not overall a model of clarity, but the quoted portions are directly concerned in the solution of the problem presented and should be carefully noted.

### 1. The Testator's Intent

No rule of law is more clearly established than that:

"In construing a trust, the settlor's intention controls and is to be ascertained and given effect, unless opposed to law or public policy." (90 Corpus Juris Secundum 26, Section 162a.)

It appears that, at least on this point, there is complete agreement in the instant case.

In this topic the matter of the intent of the testator,

or settlor of the trust, toward his widow and children as beneficiaries is considered, recognizing that intent also figures in an examination of the powers of the trustees. Counsel for the appellant puts two interesting propositions. The first, that "the testator had great confidence in his wife, Eda Sells, and she was the principal object of his bounty." And, the second, "Amaziah Sells was not unaware of his moral obligation to his fourteen children. All his property ultimately goes to them."

The testator gave his surviving widow a life estate in "our home," provided she remained unmarried, and two-thirds of the income from the trust corpus during her lifetime or until she remarried. As counsel puts it, as to the fourteen children—the farm "ultimately goes to them." This pattern Scott refers to as successive beneficiaries, life tenant and remaindermen. In III Scott on Trusts 1744, Section 232, the basic rule and corollary are set out as follows:

"Where there are two or more beneficiaries of a trust, the trustee is under a duty to deal impartially with them. This principle has its commonest application where there are successive beneficiaries. * * * the interests of the two beneficiaries are to a certain extent antagonistic, and the trustee is under a duty so to administer the trust as to preserve a fair balance between them. * * *"

As respects the contesting parties in the instant case, to determine if there be a "principal object" of the testator's bounty the rule set out in the Massachusetts case "P" must be followed. It reads as follows:

"1. A will must be examined in its entirety in an endeavor to find out the purpose disclosed, and grammatical construction, or the order of particular sentences, is never allowed to defeat testator's general intention, as manifested by the will as a whole."

An interesting decision bearing upon the problem of "intent" is provided by a New Hampshire court in "I." A trustee asked court permission to invade the principal of the trust to provide care and support for the widow entitled to income for life. The New Hampshire Supreme Court provides a rule in such a case, as follows:

"3. Where a remainder succeeding a life estate may ultimately vest in persons as yet undetermined and perhaps unborn, invasion of principal for benefit of life tenant will be permitted only to extent that testator's disclosed intention affords it a foundation."

The court allowed invasion of the principal and noted that the evident intent of the testator was to provide for his widow and that the other interests were secondary and would take subject to that interest.

The court also noted the general power of the trustee "to do all things in relation to the trust which the testator could have done if living," although suggesting that it was obscure. The widow was 82 years of age and the court found her to be "ill and infirm and the income of the trust is insufficient to afford her adequate subsistence."

This departure from the requirement of a trustee to "preserve a fair balance" is best understood when it is noted that the remaindermen, "then living issue," were adult sons and a minor son of a deceased son, represented by a guardian *ad litem,* joined with the trustee in the request to invade principal. See also "D," in which the New York court found the wife to be the "nearest and dearest object of the testator's solicitude," the remaindermen being collateral relatives. Also, the deceased husband had made direct gifts to his wife and advised her to hold shares in a certain realty venture for appreciation.

Basic rules announced by Scott must apply in the instant case.

*2. The Trustee's Power to Sell the Trust Asset*

Examination as to the power of the trustees to sell the significant trust asset, the 151-acre farm, involves the intent of the testator as shown by the provisions of the will and the proper construction of the language used therein.

Nowhere in the instrument before us can there be found a broad grant of unrestricted power to sell conferred upon the trustees. There is likewise no unlimited specific direction to sell under certain conditions. Some language clearly indicates an intent that sale be delayed. As it is put in the annotation in 103 A. L. R. 1280, "the scheme of his will indicated that he anticipated delay in the estab-

lishment of a fund." The testator indicates a desire that "my estate be held intact" awaiting a time of best advantage. That the testator contemplated that the trust might continue "intact" appears from the suggested date of June 1, 1972, twenty-one years after his death, at which time the trustees were to immediately proceed to advertise and sell. That direction, however, was contingent upon a request of "beneficiaries entitled to one-half or more of the distributive shares." Other provisions in the will permit the initiative to be taken by the trustees, but approval by the same one-half or more of the beneficiaries is imposed. Notwithstanding these expressions of the testator's intent, the widow elected not to take under the statute but under the will.

At this point, a matter of construction is imperative, since it relates to the one-half or more of the beneficiaries noted above. Counsel for the plaintiff states in his brief that the assets of the trust might be sold at any time during twenty-one years "after the *execution* of the will" if the trustees so proposed and "beneficiaries entitled to more than half of the income concurred." Counsel suggests that Eda Sells, if alive, had in effect an absolute veto power. Such veto power must arise from the fact that Eda Sells was entitled to two-thirds of the income from the trust corpus. Later, counsel asserts that, "After 21 years she by her sole act can force a sale and distribution." Again, this contention must be based upon the fact of her right to two-thirds of the trust income.

This position taken by counsel, that the use of the term "beneficiaries" by the testator means recipients of the trust income, persists throughout his whole argument whenever consideration of the consent of one-half of the beneficiaries is required. It has been conceded that the will of Amaziah Sells is not a model of clarity, but as to this point the intent of the gentleman is unmistakable. Language used in Item IV of the will is clear. At page three, it is provided that the trustees may take the initiative and determine it to be advantageous to sell the farm. If they should so decide, it is required that "they shall notify the beneficiaries—that is to say, my children or their heirs—, by registered mail." Further, the provision is that if "more

than one-half of the distributive interests approve" the trustees may consummate a sale.

The use of the term "distributive interests" clarifies and reinforces the "that is to say, my children or their heirs" statement as being those intended to approve or veto by a vote, one-half or more being required to approve. Eda Sells was not entitled to a "distributive" share under the will of Amaziah Sells. In the case of a sale and distribution, a two-thirds portion of the proceeds was required to be held and invested, the income going to her for her lifetime, the final distribution of the retained two-thirds to come at her death. Eda Sells never held a distributive interest and could not have approved or vetoed a proposal as has been suggested. (Item IV, pages 3 and 4.)

Decisions and text material deal most generally with "unproductive" assets in trust estates. The exception is 33 American Jurisprudence (beginning page 861) in which the text writers speak of "under-productive" assets as well. In the instant case there is no evidence that the trust asset was ever "unproductive." On the contrary, the accounts of the trustees all show net income and distribution to those entitled to shares in that income. The approach in this discussion is as though the distinction makes no difference in rule. Rules appearing in texts and decisions seem to respect the authority, or lack of it, as shown by the trust instrument. In some instruments the trustees are given express power of sale, without limitation; in some there is limited restriction; and in others careful and detailed restrictions. Illustrative material as to general propositions and particular case patterns are noted.

I Restatement of the Law of Trusts 2d 595, Section 240, suggests basic rules, as follows:

"By the terms of the trust the trustee may be directed or permitted to retain unproductive property."

"The intention of the settlor to direct or permit the trustee to retain unproductive property may appear from the terms of the instrument as interpreted in the light of all the circumstances. * * *"

III Scott on Trusts 1877, Section 240.1, makes a slightly different emphasis, as follows:

"The trustee is not of course under a duty to sell un-

productive property if he is directed or authorized by the terms of the trust to retain it. This is true not only where the trust instrument contains an express direction or authorization but also where it appears in the light of all the circumstances that the settlor intended that the trustee might retain the property even though it is unproductive. * * *''

Some decisions provide guidance. A Massachusetts case, ''A,'' shows a testator to have given all his property to trustees, ''To invest and reinvest the same at their discretion, in such securities * * *,'' with no limitations. The unimproved real estate in the trust ''did not produce sufficient income to pay the taxes and expenses upon it.'' The court held that the ''testator obviously intended that the entire property should be converted into one fund, and that the unproductive and speculative investments which he had at the time of his death should be changed without unreasonable delay.''

In ''B,'' which decision, by the way, contains a nice history of the doctrine of apportionment, the trustee was given broad powers as to all trust property, as follows:

''To convert the same into interest bearing securities such as are authorized by law for the investment of trust funds * * *,'' with the additional provision that the trustee could ''vary such investments at her discretion.''

The court found from ''the unconditional nature of the directions'' given by the settlor, as follows:

''* * * There is nothing in the terms of the trust to indicate that the trustor did not have this land in mind when he gave the trustee directions to sell his property. * * *''

A clean-cut situation is provided by ''C.'' The executors were directed to sell unproductive real estate, which was the principal asset, and put one-fourth of the net proceeds in the trust. The court said:

''* * * The provision for converting it into personalty was imperative, * * *.''

''D'' is another illustration of unrestricted grants of authority to a trustee. The settlor gave two authorizations, ''to sell and dispose of all his real estate * * * for the purpose of making a final distribution,'' and ''in its discre-

tion to sell at any time any of his unproductive real estate."
Such grants of power create no problems.

Some cases hold that a trustee has a duty to convert
unproductive real estate when there is "no specific declar-
ation to the contrary," as in "E." The rule announced
is as follows:

"1. Unless clearly directed by trust instrument, trus-
tee should not indefinitely hold unproductive securities."

A New York case, "G," involved a broad power, and
interesting new corollary principles are injected by the
court. The broad power is as follows:

"* * * and to sell my real estate at public or private
sale, and to lease or mortgage the same."

The corollaries suggested are that changes in circum-
stances adverse to the trust transform the discretionary
power of a trustee to sell into an imperative power and
that the decision must be based on the facts in a particular
case.

"H" is a Delaware case in which the trustee had
power to sell at private or public sale and elected to hold
the real estate twenty years before selling it. Such holding
was clearly within his discretionary power even though
it created problems as noted later herein.

In the case before us there is no unrestricted power
to sell, and no specific unconditional direction to sell. On
the contrary, there is displayed a reasonably clear inten-
tion on the part of the testator that his farm should be held
intact for as much as twenty-one years. The instant fact
pattern bears no resemblance to any of the cases investi-
gated in which the courts found a duty to sell.

Perhaps this case could be resolved at this point,
but because of the other questions presented by counsel
the risk of creating merely dictum is assumed.

3. *The Conflict of Interests Among Trustees as Bearing*
*on Possible Removal*

The Restatement of the Law of Trusts 2d states a cause
for removal of a trustee at page 236, Section 107, as fol-
lows:

"* * * unreasonable or corrupt failure to co-operate
with his co-trustees."

By way of elaboration, at page 236 the text says:

"(c) Mere friction between the trustee and the beneficiary is not a sufficient ground for removing the trustee unless such friction interferes with the proper administration of the trust."

And, further, at page 236, it is said:

"* * * the mere fact that the trustee named by the settlor is one of the beneficiaries of the trust is not a sufficient ground for his removal * * *."

A testator institutes potential conflict when he appoints a life tenant and remaindermen as trustees. Certainly, any conflict which ensues cannot be said to be of their own making. In spite of strain, the duty of the trustees is plain. The court in "E" puts it as follows:

"2. Trustee, standing as he does between life tenant and remainderman, must not favor one at expense of other."

That there was conflict in the instant case is reasonably certain. It comes through clearly from the record that the children of Amaziah Sells, the remaindermen, did not want to sell the farm, and that Eda Sells requested the sale and the children knew of the request. The conflict seems to have been very real at times. Even if the conflict developed to be more than "mere friction," nothing indicates a "corrupt failure to co-operate." It is clear that there never was a failure to pay Eda Sells her portion of income, and the record indicates that all farm expenses were paid from trust income to protect her right to live in the home place.

The co-trustees of Eda Sells knew of her request to sell the farm, and it is likely that many of the remaindermen, if not all of them, knew of the request. A request to sell, however, does not become a duty to sell without a testamentary power or direction, or without the great weight of circumstances sufficient to overcome a testamentary void. The farm was productive, Eda Sells had a home with certain expenses paid, and there was no evidence indicating hardship comparable to that of the 82-year-old lady, ill and infirm, as in "I."

In addition to the testamentary hurdles limiting the sale of the farm noted above, there are other limitations,

not the least of which are the life estates of Eda Sells and Ruth Hanover. These are very practical ones. Eda Sells could not have been ejected from the home during her lifetime unless she remarried. Ruth Hanover still has a right to live there if she desires to do so. Certainly real estate may be sold encumbered with a life estate, or the right to live in "our home," but it is equally certain that few would want to buy it. Ruth Hanover could still defeat the full-value sale of the farm.

Other obstacles confronted the trustees. There is no evidence in the record to show that the trustees ever had a firm offer to purchase. Mrs. Hanover, a trustee, testified that "there has been no buyers—there has been no market for that kind of property." The record shows a proposition to lease 165 acres with an option to purchase from Charles McGreevey, but nothing came of it. The testimony is that John W. Galbreath Company refused to list the farm for sale in 1961.

There was no duty to sell devolving upon the trustees by reason of the request of Eda Sells, and the panorama of market circumstances and legal handicaps dispels any suggestion of a breach of duty, i. e., "an unreasonable or corrupt failure to co-operate," justifying the removal of the co-trustees with Eda Sells.

*4. The Significance of an Underproductive Asset*

Texts talk about "wasting property," "unproductive property," and "underproductive property." Scott rather persistently refers to unproductive, rarely to underproductive. Scott holds that in the case of successive beneficiaries the inference is that a trustee has a duty to sell an unproductive asset and invest in productive ones. The text adds to the basic rule at page 1875, Section 240, as follows:

"* * * The inference may, however, be overcome by evidence that the testator intended to permit the trustee to retain the property in the trust even though it is unproductive."

The Restatement of the Law of Trusts 2d 594, Section 240, speaks as to unproductive and underproductive property although the caption of the section notes only the former. The rule is as follows:

"If the trust property produces an income which is substantially less than the income which would be derived if the property were sold and the proceeds were invested so as to yield the current rate of return on trust investments, the trustee is under a duty to the life beneficiary to sell the property and invest the proceeds. The mere fact, however, that the income derived is somewhat less than such return does not impose a duty upon the trustee to sell the property. The duty arises only where the difference is so great that it is unfair to the life beneficiary to retain the property."

Our concern is with underproductive property. There is no evidence that the farm at any time failed to produce income or became a burden upon trust income for "carrying charges" reducing or destroying all income for the surviving widow. In fact, there is no evidence indicating just how "underproductive" the farm was. The claim is that the return was less than the "normal rate of return." Counsel says 5 per cent "probably represents the normal rate." No effort was made to show a prevailing normal rate. An attempt was made on cross-examination to elicit an opinion from Attorney Horst as to what a "reasonable return" on invested funds would be. Objection was made and sustained to this only reference to ordinary and prevailing rates of return in the entire transcript. Such omission makes comparison impossible and the "underproductive" assertion simply a matter of allegation. The Restatement of the Law of Trusts 2d, quoted above, speaking of underproductive property, suggests that the duty to sell "arises only where the difference is so great that it is unfair to the life beneficiary to retain the property." This suggestion is, however, in the nature of a corollary proposition and it in no sense supersedes the basic rules previously noted that the terms of the trust and the settlor's intention are controlling.

*5. A Right to Apportionment and the Possibility of Such Right Becoming a Vested Interest*

General rules approving the doctrine of apportionment appear in text materials. Variations in application also

appear. Examination of some of the cases cited leaves but one conclusion and that is that courts apportion or refuse to apportion depending upon the circumstances of each particular case. Attention is directed first to text sources.

90 Corpus Juris Secundum 648, Section 355 d (1), speaks generally as follows:

"Where trust principal and income are represented in an investment or fund, an apportionment should be made between the life tenant and the remainderman."

Qualifications appear, page 646, Section 355 c, as follows:

"Unless the trustor has clearly directed otherwise, or the circumstances require a different result, money, including profits, from the sale of trust property constitutes part of the principal, and not income."

And, at page 649, Section 355 d, it is said:

"* * * but the question is one of the intent of the creator of the trust. * * *"

III Scott on Trusts 1883, Section 241, generalizes concerning unproductive investments, and says:

"* * * beneficiary is entitled to income from the day when the duty to sell arose. * * *"

And at page 1884, Section 241.1, it is said as follows:

"The rule as to apportionment of the proceeds of sale between income and principal is applied where the property is unproductive. * * *"

And, when ascertained, "the current rate of return on trust investments * * *" should be respected in such allocation. Scott also suggests that allocation is much more difficult where the investment property is "underproductive." It is noteworthy that the cases considered all involve unproductive property, suggesting that courts may be wary of the complexities involved in disposing of the underproductive.

There are also general pronouncements in the text materials concerning the vesting of the right of apportionment. III Scott on Trusts 1919, Section 241.6, puts the rule, as follows:

"The rule as to apportionment of the proceeds of sale

of unproductive or wasting or hazardous property is applied although the sale does not in fact take place until after the termination of the life beneficiary's interest."

Scott adds, at page 1920, that the estate of the deceased is entitled to a portion of the proceeds from "unproductive property which is not sold until after the death of the life beneficiary * * *," reflecting the New York view (following "N"), that "The ultimate salvage represents an interest-bearing investment and represents or reflects both capital and accrued income * * *." The Pennsylvania rule discussed by Scott suggests a limitation, as follows:

"* * * even though there may be an apportionment of the proceeds of unproductive property sold after the death of one of two successive life beneficiaries, yet no apportionment will be made where the sale is made after the time for the termination of the trust."

33 American Jurisprudence 862, Section 351, speaking of both unproductive and underproductive property, says that the rule permitting apportionment is held applicable only "(1) after such property itself has actually been sold and (2) it has been determined that during the period of its holding in the trust estate it has been unproductive."

The variation in circumstances presented in the cases reviewed seems to work against any reasonable classification of situations. There is, however, a group of situations in which the application of the doctrine of apportionment seems quite appropriate, in which the picture presented can be said to be black and white in contrast to another group of cases distinctly gray. Typical of the first group are the *Holmes, Trustee, cases,* "R" and "S." Especially note "R," the Supreme Court case, which is clear cut, dealing as it does with the income from a business operation having been reinvested to accomplish business expansion. The court directed, as follows:

"(c) The books of account should be so kept as to reflect currently the total net assets of the trust. The difference between the total net assets and the original amount of the corpus will represent additions to capital,

resulting from the trustee's use of income, and the life tenant will be entitled to receive the amount of additional capital so supplied from income upon sale of the business or termination of the trust, but such payment to her shall not reduce the amount of original corpus.''

Equally as clear, entitlement to apportionment occurs where the trustee received only stock dividends during a period in which there was no cash income for distribution as in "E.'' The court announced a general rule, as follows:

"* * * when a conversion is made, the life tenant is entitled to receive a portion of the proceeds to recompense him for the loss of income suffered in the meantime. * * *''

And that court added a word of caution, also, as follows:

"* * * It is clear that such procedure might result in turning over to the life tenant, in addition to proper income, a large amount of the capital, which, of course, must be retained for the ultimate benefit of the remaindermen * * *''

A reasonably clear situation is presented in "H.'' The real property had been held for twenty years and the expenses paid from other trust income at the cost of the life tenant. After the expense of sale had been deducted from the proceeds, the balance was apportioned at a current rate of 3.7 per cent, allowed from the time of the life beneficiary's death. It may have been significant that the life tenant had a power of appointment, and in case of failure to exercise the power of appointment the remainder was for a charitable purpose.

Some gray area cases order apportionment and others refuse to order. Particular and unusual circumstances appear to be the deciding factor in the attitude of the courts. Even though the decisions confuse, the cases present fact patterns worthy of note and are useful in comparison with the instant case.

In "B,'' a ranch was sold, which, though not unproductive, had operated at a loss. Apportionment was di-

rected, the court saying that it must be done "unless it is otherwise provided by the terms of the trust." And then, this added comment follows:

"* * * The rule of apportionment may not be employed to add terms to the trust instrument but only as a means of giving effect to those stated. * * *"

"F" involved an *inter vivos* trust created by husband and wife. "Badly incumbered" real estate, a part of the trust corpus, was sold and the surviving widow allowed part of the proceeds of the sale as income. The court said that the settlors did not to intend to cut the widow off from income.

Carrying charges pending the sale of unproductive real estate were charged to the total of the proceeds derived and the balance apportioned by the court in "G." The court observed that, "The decision is based on the facts of the particular case."

Stock was sold at a greatly enhanced price in "J," the substantial increase in price coming after the decease of the life tenant. The court held that the increased price was not income but addition to principal. The court's pronouncement is as follows:

"* * * in the absence of a clear direction in the will to the contrary, where investments are made by the trustee, the principal must be maintained intact from loss by payment of premiums on securities having only a definite time to run; * * *."

A mortgage was foreclosed and real estate sold after the death of the life beneficiary in "K." The reviewing court in reversing the Probate Court refused to allow apportionment, suggesting that a salvage operation was still incomplete and something might happen to prevent maintaining the full face value of the investment.

In "M," a mortgage was foreclosed and a loss followed, ascertained after the death of the life tenant. The court ordered effectual apportionment after death, saying:

"* * * when the loss is not ascertained until after the death of the life tenant, the interest upon the principal sum involved, from the death of the life tenant to the date of the

ascertainment of the loss, is to be added to and form part of the principal sum."

The court suggested that remaindermen are not and should not be free of perils and may not shift such burden entirely on a life tenant. The proposition is as follows:

"* * * the loss should be equitably apportioned between the innocent life tenant and remaindermen to their respective rights at the time the loss is ascertained and the apportionment of it is made; * * *"

Note particularly "L," because it speaks squarely as to the vesting of the right of apportionment. The syllabus rule requires the trustee "acting in the exercise of a sound discretion" to sell unproductive property as soon as it can be done "under all the circumstances." In *Ogden* ("L"), apportionment had been made as to sale before the death of the beneficiary but the court held as to the sale then before it, as follows:

"* * * The sale was not made until after her death; consequently, the fund did not come into existence until after that date and until all her rights under the trust had ceased. At the time when the fund was created, she had no beneficial interest in the trust."

Finally, a spendthrift trust is noted, "O." Mortgages had been foreclosed and real property acquired, forty-one parcels remaining unliquidated at the time of the death of the spendthrift. The court found that liquidation would require a long time and the life of the trust should not be unduly extended, since its purpose had been accomplished. Apportionment was refused. The court speaks, as follows:

"* * * Moreover, the requested apportionment would defeat the clear intention of the testator that the life tenant was to receive the income under a spendthrift trust free of creditor's claims."

And the court added that:

"* * * To hold otherwise would be to reverse the maxim, and compel remaindermen to starve so that creditors and heirs of life tenants, to whom the testator intended no benefit, should feast."

These cases are samples of the variety of circum-

stances considered by courts, none of which squarely parallels the fact pattern in the Sells trust. Only confusion can result from the variety. In hope of dispelling a little of the confusion, note an annotation in 103 A. L. R., at page 1279 *et seq.*, which discusses cases in which apportionment was held improper. Reference is to a New York case included in the annotation in which the court looked particularly at "C," noting that the Court of Appeals in "C":

"* * * did not intend to establish the absolute rule for every case involving unproductive real property in a trust fund, that there must be an apportionment between principal and income when such real property is sold * * *."

Commenting further on "C," the court distinguished the case before it. The court in the annotated case speaks of "C," as follows:

"The rule laid down therein was for the purpose of preventing the life tenants suffering a diminution of income or a total loss of income by reason of the heavy carrying charges on unproductive real property where the latter constitutes the greater portion of the estate."

The annotation comments on the *Rowland case*, "G," and suggests a summary arising therefrom, which it is hoped may bring order out of chaos. The situations when apportionment will be made are said to be " (1) If there is an imperative direction for sale thereof contained in the will; or (2) if it is inferable from the situation of the testator at the time of the drawing of the will that he desired that arrangement to be made." And, by way of elaboration, it is said that the intention to have apportionment made will be inferred " (1) If the life tenant was a primary object of the testator's bounty, and (2) if the testator knew that the inclusion of the property in question would wholly or materially destroy the value of the gift."

In the case here considered it cannot be said that Eda Sells was the primary object of the testator's bounty. He was concerned about both wife and children. The farm was productive at the time the will was written and never ceased to produce some income, in fact the rental from the movie lease increased during Eda Sells's lifetime. There

is nothing to suggest that Amaziah Sells knew that the inclusion of the farm as a trust asset would destroy the gift to the life tenant. The trustees did not have an unlimited discretionary power of sale as was true in cases "E," "F," "G," "H," and "J." There has been no sale, nor could there have been, without the consent of two life tenants and more than one-half of the remaindermen. There is no evidence as to the comparative or real diminution in income to the widow, nor evidence as to a prevailing rate of return on trust property to be compared to the rate of return on the farm.

There is no imperative direction to sell given the trustees of the Amaziah Sells trust, therefore apportionment is not required. Also, there is no support for an inference from the situation of the testator at the time he made his will so as to require apportionment. Furthermore, perhaps incidentally, there has been no sale and the interest of Eda Sells in the trust has terminated.

### 6. Possible Estoppel

It is interesting to note that cases "B," "G," "J," "K," "L," and "M," arose out of challenges directed to an account or distributive action or allocation made by a trustee. It is not necessary for us to find an estoppel, but the records show regular distribution of income to the life beneficiary and no challenge to the accounts as filed over the signature of Eda Sells. It could well be that the only appropriate action available to Eda Sells was an action to surcharge the trustees for dereliction of duty. Case law relative to trusts is extremely meager in Ohio. One Ohio case, "Q," offers some encouragement to the plaintiff when he urges removal of the trustees, but the case also announces a significant rule. It is found on page 263, as follows:

"* * * The express provisions of the will are absolute and must guide the trustee in the administration of this trust. * * *"

Incidentally, that proposition is supported in "S," as follows:

"* * * where the language of the will is plain and rea-

sonably clear the court may not qualify or control it by conjecture because of doubt arising from extraneous evidence; * * *''

*In Conclusion*

The transcript of evidence has been examinated. Much of the evidence relates to the demand made by Eda Sells to sell the farm and whether the remaindermen knew of that demand. Emphasis is also on the increasing value of the farm, but without a sale, or at least a firm offer, such evidence becomes essentially speculative froth, difficult to translate into a real denial of any right to income for Eda Sells. Especially is that true where there is no evidence to establish just how ''underproductive'' the farm was, and no showing that it was ''so great that it is unfair to the life tenant.'' There is no showing that the widow was in great need, and no evidence that the asset produced ''no income,'' so as to create a possible legal duty to sell on demand. If the proof were abundant the demand to sell, in the instant case, could not surmount the specific limitations contained in the testamentary instrument and the obvious intention of the settlor that the property could and should be retained.

The assignments of error asserted by the appellant are not well taken.

The judgment of the trial court is affirmed and this appeal dismissed at appellant's costs.

*Judgment affirmed.*

DUFFY and HERBERT, JJ., concur.

CASES CITED

''A'' *Edwards* v. *Edwards* (1903), 183 Mass. 581, 67 N. E. 658.

''B'' *In re Bothwell's Estate* (1944), 65 Cal. App. 2d 598, 151 P 2d 298.

''C'' *Lawrence* v. *Littlefield* (1915), 215 N. Y. 561, 109 N. E. 611.

"D"  *In re Jackson's Will* (1932), 258 N. Y. 281, 179 N. E. 496.

"E"  *Rhode Island Hospital Trust Co.* v. *Tucker* (1932), 52 R. I. 277, 160 A. 465.

"F"  *Quinn* v. *First Nat. Bank* (1934), 168 Tenn. 30, 73 S. W. 2d 692.

"G"  *In re Rowland's Estate* (1937), 273 N. Y. 100, 6 N. E. 2d 393.

"H"  *Delaware Trust Co.* v. *Bradford* (1948), 30 Del. Ch. 277, 59 A. 2d 212.

"I"  *Petition of Wolcott* (1948), 95 N. H. 23, 56 A. 2d 641.

"J"  *In re Stevens* (1907), 187 N. Y. 471, 80 N. E. 358.

"K"  *McKechnie* v. *Springfield* (1942), 311 Mass. 402, 41 N. E. 2d 557, 142 A. L. R. 257.

"L"  *Ogden* v. *Allen* (1917), 225 Mass. 595, 114 N. E. 862.

"M"  *In re Tuttle* (New Jersey Prerog. Court, 1892), 24 A. 1.

"N"  *In re McManus' Will* (1940), 282 N. Y. 420, 26 N. E. 2d 960.

"O"  *In re Spear's Estate* (1939), 333 Pa. 199, 3 A. 2d 789.

"P"  *Sears* v. *Childs* (1941), 309 Mass. 337, 35 N. E. 2d 663.

"Q"  *Willis* v. *Holcomb, Trustee* (1911), 83 Ohio St. 254.

"R"  *Holmes, Trustee,* v. *Hrobon* (1953), 158 Ohio St. 508.

"S"  *Holmes, Trustee,* v. *Hrobon* (1951), 93 Ohio App. 1.